Jeffrey S. Abraham (JA-2946)
Jack G. Fruchter (JF-8435)
Arthur J. Chen (AC-5233)
**ABRAHAM, FRUCHTER & TWERSKY, LLP**
One Penn Plaza, Suite 2805
New York, N.Y. 10119
Telephone: (212) 279-5050
Facsimile: (212) 279-3655



**Plaintiff's Counsel**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| JUNO KNITTING MILLS, INC., on behalf of itself and all others similarly situated,<br><br>        Plaintiff,<br><br>   v.<br><br>WILLIAM PRYM GMBH & CO.,KG; PRYM CONSUMER USA, INC.; PRYM FASHION, INC.; COATS PLC; COATS NORTH AMERICA DE REPUBLICA DOMINICANA, INC.; YKK CORPORATION;  YKK CORPORATION OF AMERICA, INC.; YKK (U.S.A) INC.; YKK SNAP FASTENERS AMERICA, INC.; AND SCOVILL FASTENERS, INC.<br><br>        Defendants. | **CIVIL ACTION NO.**<br><br><br>**<u>CLASS ACTION COMPLAINT</u>**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

Plaintiff, by and through his attorneys, brings this civil action against the above named defendants (collectively, "Defendants") for damages under the Sherman Antitrust Act. Based on personal knowledge with respect to itself and its own actions, and on information and belief based upon *inter alia*, the admission of three defendants, and the investigation by counsel, the Plaintiff alleges as follows:

## NATURE OF THE ACTION

1.     Defendants are manufacturers of Fasteners and Attaching Machines, including, but not limited to, snap fasteners, open prong fasteners, capped fasteners, zippers, tack buttons, hooks & eyes, rivets, eyelets, buckles, burrs, post or prone rings, boot hooks, sockets, backplates, studs, screw studs, pots, washers, grommets, caps, locking fasteners, and similar fastening devices that affix two or more objects together. Fasteners and Attaching Machines are an essential ingredient in the manufacturing of clothes and shoes in the garment, apparel and footwear industries and are used by end consumers in their daily lives. They are estimated to represent approximately 4% of the total apparel cost, and the United States market for Fasteners and Attaching Machines is estimated at over $600 million in annual sales.

2.     Defendants and their co-conspirators engaged in a worldwide conspiracy to fix, raise, maintain and/or stabilize prices of Fasteners and Attaching machines, and allocated customers and geographic markets for their products. As a result of Defendants' collusive conduct, Plaintiff and other purchasers of Fasteners and Attaching Machines have paid artificially inflated prices. Plaintiff brings this action for damages under Section 1 of the Sherman Act, 15 U.S.C. § 1, on behalf of all persons and entities

that purchased Fasteners and Attaching Machines directly from any of the Defendants or
their co-conspirators during the period January 1, 1977 through the present.

## The Parties

3.      Plaintiff Juno Knitting Mills, Inc. purchased Fasteners and Attaching
Machines directly from one or more of the Defendants during the Class Period and was
injured as a result of Defendants' illegal conduct.

4.      Defendant William Prym GmbH & Co. KG ("Prym") is organized under
the laws of Germany, with its principal place of business at Zweifaller Strabe 130, D-
52224 Stolberg, Germany.  During the time period covered by this Complaint, William
Prym GmbH & Co. KG manufactured, sold and distributed Fasteners and Attaching
Machines to customers throughout the United States.

5.      Defendant Prym Consumer USA, Inc. ("Prym Consumer") is a wholly
owned subsidiary of Prym, with its principal place of business at 950 Brisack Road,
Spartanburg, SC 29303.  During the time period covered by this Complaint, Prym
Consumer USA, Inc. manufactured, sold and distributed Fasteners and Attaching
Machines to customers throughout the United States.

6.      Defendant Prym Fashion, Inc. ("Prym Fashion") is a wholly owned
subsidiary of Prym, with its principal place of business at 950 Brisack Road, Spartanburg,
SC 29303.  During the time period covered by this Complaint, Prym Fashion, Inc.
manufactured, sold and distributed Fasteners and Attaching Machines to customers
throughout the United States. William Prym GmbH & Co KG, Prym Consumer USA,
Inc., and Prym Fashion, Inc. are referred to collectively herein as the "Prym Group".

7.    Defendant YKK Corporation ("YKK") is organized under the laws of Japan, with its principal place of business at 1, Kanda Izumi-cho, Chiyoda-ku, Tokyo 101-8642, Japan. During the time period covered by this Complaint, YKK Corporation manufactured, sold and distributed Fasteners and Attaching Machines to customers throughout the United States.

8.    Defendant YKK Corporation of America, Inc. ("YKK America") is a wholly owned subsidiary of YKK, with its principal place of business at One Parkway Center, 1850 Parkway Place, Suite 300, Marietta, Georgia 30067 and 301 Route 17 North, Suite 503, Rutherford, New Jersey 07070. During the time period covered by this Complaint, YKK Corporation of America, Inc. manufactured, sold and distributed Fasteners and Attaching Machines to customers throughout the United States.

9.    Defendant YKK (U.S.A.) Inc. is a wholly owned subsidiary of YKK, with its principal place of business at 1300 Cobb Industrial Drive, Marietta, Georgia 30066. During the time period covered by this Complaint, YKK (U.S.A.) Inc. manufactured, sold and distributed Fasteners and Attaching Machines to customers throughout the United States.

10.    Defendant YKK Snap Fasteners America, Inc. ("YKK Snap Fasteners") is a wholly owned subsidiary of YKK, with its principal place of business at 302 Factory Avenue, Lawrenceburg, Kentucky 40342. During the time period covered by this Complaint, YKK Snap Fasteners manufactured, sold and distributed Fasteners and Attaching Machines to customers throughout the United States. YKK Corporation, YKK Corporation of America, Inc., YKK (U.S.A.) Inc., and YKK Snap Fasteners America, Inc. are referred to collectively herein as the "YKK Group".

11.    Defendant Coats PLC is organized under the laws of the United Kingdom, with its principal place of business at 1 The Square, Stockley Park, Uxbridge, Middlesex, UB11 ITD, United Kingdom.  During the time period covered by this Complaint, Coats PLC manufactured, sold and distributed Fasteners and Attaching Machines to customers throughout the United States.

12.    Defendants Coats North America de Republica Dominicana, Inc. is a wholly owned subsidiary of Coats PLC, with its principal place of business at 3430 Torington Way, Suite 301, Charlotte, North Carolina 28201 and 4135 South Stream Blvd., Charlotte, North Carolina 28277.  During the time period covered by this Complaint, Coats North America de Republica Dominicana manufactured, sold and distributed Fasteners and Attaching Machines to customers throughout the United States. Coats PLC and Coats North America de Republica Dominicana, Inc. are referred to collectively herein as the "Coats Group".

13.    Defendant Scovill Fasteners, Inc. is Delaware corporation with its principal place of business at 1802 Scovill Drive, Clarkesville, Georgia 30523.  During the time period covered by this Complaint, Scovill Fasteners, Inc. manufactured, sold and distributed Fasteners and Attaching Machines to customers throughout the United States.

## CO-CONSPIRATORS

14.    Various others, presently unknown to Plaintiff, participated as co-conspirators with the Defendants in the violations of law alleged in this Complaint and have engaged in conduct and made statements in furtherance thereof.

15.    The acts charged in this Complaint have been done, within this district and worldwide, by Defendants and their co-conspirators, or were authorized, ordered or done

by their respective officers, agents, employees or representatives while actively engaged in the management of each Defendant's business or affairs.

## JURISDICTION AND VENUE

16.     This complaint is brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to obtain relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1.

17.     The Court has jurisdiction pursuant to 28 U.S.C. §1331 and §1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26.

18.     Venue is proper in this District under 15 U.S.C. §22 and 28 U.S.C. §1391 because one or more Defendants reside, transact business, or are found within this District, and a substantial part of the events giving rise to the claims arose in this District.

19.     This Court has personal jurisdiction over each Defendant because, *inter alia*, each Defendant: (a) transacted business throughout the United States, including this District; (b) had substantial contacts with the United States, including in this District; and/or (c) was engaged in an illegal antitrust conspiracy that was directed at and had the intended effect of causing injury to persons residing in, located in, or doing business throughout the United States, including in this District.

## CLASS ACTION ALLEGATIONS

20.     Plaintiff brings this suit as a class action pursuant Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of itself and a class (the "Class") composed of and defined as follows:

> All persons and entities (excluding governmental entities,
> Defendants and their parents, predecessors, subsidiaries,
> affiliates, and co-conspirators) residing in the United States
> who purchased Fasteners and Attaching Machines directly
> from the Defendants from January 1, 1977 through the present.

21.    Plaintiff does not know the exact number of Class members because such information is in the exclusive control of Defendants or their co-conspirators. Due to the nature of the trade and commerce involved, however, Plaintiff believes that Class members number at least in the thousands and are sufficiently numerous and geographically dispersed throughout the United States so that joinder of Class members is impracticable.

22.    The Class is ascertainable and there is a well-defined community of interest among the members of the Class.

23.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff purchased Fasteners and Attaching Machines from one or more of the Defendants or their co-conspirators, and therefore Plaintiff's claims arise from the same common course of conduct giving rise to the claims of the members of the Class and the relief sought is common to the Class.

24.    The following common questions of law or fact, among others, exist as to the members of the Class:

   a.    Whether Defendants engaged in a combination or conspiracy to fix, raise, maintain and/or stabilize the prices for Fasteners and Attaching Machines;

   b.    The identity of participants in the conspiracy;

c.    The duration of the conspiracy alleged in this Complaint and the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

d.    Whether the alleged conspiracy violated Section 1 of the Sherman Act;

e.    The effect of Defendants' conspiracy on prices of Fasteners and Attaching Machines;

f.    Whether the conduct of Defendants, as alleged in the Complaint, caused injury to the business or property of Plaintiff and the other members of the Class; and

g.    The appropriate measure of damages sustained by Plaintiff and the other members of the Class.

25.    These and other questions of law or fact which are common to the members of the Class predominate over any questions affecting only individual members of the Class.

26.    Plaintiff will fairly and adequately protect the interests of the Class in that Plaintiff has no interests that are antagonistic to other members of the Class and has retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent itself and the Class.

27.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all damaged Class members is impractical. The damages suffered by many individual Class members are relatively small, given the expense and burden of individual prosecution of the claims

asserted in this litigation.  Thus, absent the availability of class action procedures, it would not be feasible for many Class members to redress the wrongs done to them.  Even if the Class members could afford individual litigation, the court system could not.  Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system.  Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economies of scale and comprehensive supervision by a single court.

28.    Defendants have acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

29.    In the absence of a class action, Defendants would be unjustly enriched because they would be ale to retain the benefits and fruits of their wrongful conduct.

## INTERSTATE TRADE AND COMMERCE

30.    During the time period covered by this Complaint, Defendants and their co-conspirators sold and distributed Fasteners and Attaching Machines to and throughout the United States.  Defendants and their co-conspirators manufactured, sold and shipped Fasteners and Attaching Machines in a continuous and uninterrupted flow of interstate and international commerce.  During each year of the Class Period, total sales of Fasteners and Attaching Machines were in the billions of dollars.

## FACTUAL ALLEGATIONS

31.    The European Commission ("the Commission")applies and enforces the laws of the European Community, including its competition law.  The Commission can

require companies to provide information and, if necessary, may carry out surprise inspections at a company's offices and, with a court order, may also inspect the homes of company personnel.

32.    On August 29, 2000, the European Commission commenced an investigation of collusive practice by manufacturers and distributors of haberdashery products after receiving a letter from Entaco Ltd. ("Entaco") accusing Prym and Coats Holdings Ltd. ("Coats") of anticompetitive conduct relating to the European hard haberdashery market.

33.    According to the Commission, hard haberdashery products include needles, knitting pins, crochet hooks, pins, zip fasteners, and other fastening products (e.g., snap buttons, rivets, and "their attaching machines"). Soft haberdashery includes thread and textile products for the leather and garment industry. Together, these are known in the United States as "notions" or small items used for sewing garments and in the manufacture of apparel and footwear.

34.    The information from Entaco led to surprise inspections by the Commission on November 7 and 8, 2001 at the offices of Coats, Prym, Entaco, and a trade association, in England and Germany. Those inspections, in turn, triggered applications from the Prym Group, the Coats Group, and the YKK Group, the three largest manufacturers in the Fasteners and Attaching Machines industry, for immunity or reduction of fines under the Commission's leniency program.

35.    Under the Commission's leniency program, companies that provide insider information about a cartel in which they participated may receive full or partial immunity from fines, provided that they fully cooperate with the Commission throughout

its investigation and prosecution, hand over all evidence in its possession, and put an end

to the infringement immediately. Companies that do not qualify for immunity may

receive reduced fines if they provide evidence that represents "significant added value" to

information already in the Commission's possession or reinforces the Commission's

ability to prove the infringement, and terminate their participation in the cartel.

36.    As a result of these inspections and its subsequent investigation, the

Commission uncovered evidence of the existence of multiple cartel agreements affecting

both hard and soft haberdashery products, at least one of which existed for more than 21

years.

37.    According to the Commission, a "cartel" is an illegal, secret agreement

between competitors to fix or increase their prices, restrict supply by limiting their sales

or their production capacities, or to divide up their markets or consumers. Cartels shield

their participants from competition, which "allows the participants to charge higher prices

and to remove the pressure on them to improve the products they sell or find more

efficient way in which to produce them. Their customers (companies and consumers)

end up paying higher prices for lower quality and narrower choice."

38.    On October 26, 2004, the Commission issued a Decision finding that,

between 1994 and 1999, Coats and its subsidiary J & P Coats Ltd., Prym and its

subsidiary Prym Consumer, and Entaco had participated in a product and geographic

market sharing agreement in Europe relating to needles and other haberdashery products.

Coats and Prym were fined a total of approximately 60 million euros. Entaco was not

fined because it had brought the anticompetitive conduct to the attention of the

Commission.

39.    On September 14, 2005, the Commission issued a Decision fining Coats and a number of other entities approximately 43.5 million euros for operating industrial thread (soft haberdashery) cartels in Europe.

40.    It was on September 19, 2007 that the European Commission imposed fines totaling 328.6 million euros (approximately $458 million) on the YKK Group, the Prym Group and the Coats Group (and their subsidiaries), together with three other manufacturers and a German trade association, "for operating cartels on the markets for fasteners and attaching machines in Europe and worldwide." (emphasis added).  The Commission further noted that any person or firm damaged by the anticompetitive behavior of these companies may bring a private action for damages "submitting elements of the published decision as evidence that the behavior took place and was illegal…"

41.    In a press release issued on September 19, 2007, the Commission stated that the evidence uncovered in the 2001 inspections revealed the existence of the following illegal cartels in the market for zip fasteners, "other fasteners" (e.g. snap buttons and rivets) and their attaching machines:

a. In 1977, the first cartel was started between the Prym Group and Coats Group through their agreement to share the whole haberdashery market between themselves;

b. The second cartel began in 1991,  when the YKK Group, the Prym Group and Scovill Fasteners Inc. agreed among other things on coordinated price

increases in annual "price rounds" with respect to 'other fasteners' and their attaching machines, in the framework of the work circles organized by the trade association Fachverband Verbindungs-und Befestgungstechnik ("VBT");

c. The third cartel was established from April 1998 to at least November 1999, during which the YKK Group, the Coats Group, and the Prym Group met on a number of occasions to exchange price information, set up minimum prices for zip fasteners in Europe, and to discuss price increases; and

d. The fourth cartel, which began in 1999 and involved the Prym Group and the YKK Group, "during which the two companies fixed prices on a product-by-product and a country-by-country basis and allocated customers <u>on a worldwide level</u> with respect to 'other fasteners' and their attaching machines." (emphasis added).

The existence of these cartels was further established by numerous documents and statements provided to the Commission by the YKK Group, the Prym Group, and the Coats Group.

42.    The Commission uncovered evidence that, with respect to each of the cartels, high ranking management of the conspirators (e.g., managing directors, sales directors, and board members) had participated in regular meetings and discussions. The Commission also found evidence that the companies were aware that their conduct was illegal.

43.    In a press release issued on September 19, 2007, the Prym Group admitted that individuals at the highest level of management were actively involved in the cartels:

"The members of the board of management of the Prym Group in charge at the times of the cartels, who are no longer active in the Prym undertakings, have at all times admitted the participation and cooperated with the Commission in its investigations."

44.    The Prym Group was the first entity to provide information to the Commission about the worldwide fasteners and attaching machines cartel and, thus, received full immunity from fines under the Commissioner's leniency program. Moreover, the fines imposed on the Prym Group for its involvement in the other three cartels were lowered (to approximately €40.5 million) as a result of its cooperation with the Commission. Pursuant to the Commission's leniency program, smaller reductions were also granted to the YKK Group, and the Coats Group (which were fined approximately €150.2 million and €122.4 million respectively), in recognition of their cooperation.

45.    It is the Commission's practice to sanction all entities responsible for illegal, anticompetitive conduct. Thus, if the parent company within a group exercises "decisive influence" over the conduct of its subsidiaries, they are considered to be part of the same economic entity. There is a presumption that a parents company exercises decisive influence of its wholly-owned subsidiary. Legal responsibility for a violation and the related fine can therefore be attributed to the subsidiaries that actually participated in the cartel and the parent company that exercised "decisive influence" over the subsidiary. Pursuant to this policy, fines for the worldwide Fasteners and Attaching machines cartel were imposed upon YKK and Prym, the corporate parents of, respectively, the YKK Group and the Prym Group.

46.     Competition Commissioner Neelie Kroes stated that: "It is unacceptable that the major fastening technology producers colluded for such a long time to maintain artificial price levels and to share customers and markets for products which are used every day by a lot of consumers. The highest management of these companies were well aware that this conduct was illegal, but decided to continue anyway."

## Price Increases and Demand Declines

47.     Prices for Fasteners and Attaching Machines have risen dramatically over the period of the alleged misconduct, beginning in the mid-1970s and continuing until the present.

48.     In particular, in spite of a remarkable decline in demand since the mid-1990s, prices of Fasteners and Attaching Machines have risen during the period since the mid-1990s by over 25 percent.

49.     Demand for Fasteners and Attaching Machines has been declining for several years, which should have acted to restrain price increases or cause prices to fall. In addition, manufacturing productivity has risen significantly over that time period, making the products less costly to produce, which should also have forced prices to decline in a competitive market. Moreover, the rise in prices of Fasteners and Attaching Machines exceeds the rise in prices of the principal manufacturing cost inputs.

50.     Instead of restrained price increases or falling prices as would be expected in a competitive market, prices for Fasteners and Attaching Machines have, in fact, dramatically increased in light of the declining demand, increasing productivity and lack of increase of cost inputs of a magnitude that would explain such price increases.

## Other Structural Characteristics of the Industry

51.    A number of structural characteristics of the Fasteners and Zippers industry facilitate the implementation and maintenance of the worldwide, horizontal conspiracy alleged herein.

52.    Fasteners and Zippers differ in material, color and tape pattern, but are essentially commodity-like products.  Products come in standard sizes, which may vary by product type within the Fastener/Zipper group.  Major suppliers advertise their products under standard trade names, suggesting that products are easily characterized in the market by material composition, design and function.

53.    It is easier to form and sustain a cartel when the product in question is commodity-like because it is easier to agree on prices to charge and to monitor those prices once an agreement is formed.

54.    Demand for Fasteners and Zippers in the United States has been in decline since at least 1995 by dramatic amounts.  *See* U.S. Census Bureau's Annual Survey of Manufacturers, Cut and Sew Manufacturing 1993 to 2005.  The apparel industry has seen production fall dramatically, with much of it being shipped overseas, especially following the passage of NAFTA and the WTO, which hastened the shift of clothing production overseas.

55.    Static or declining demand is another factor which makes the formation of a collusive arrangement more likely.  With static or falling demand firms have a greater incentive to collude to avoid price competition.

56.    The Fastener and Zipper industry in the United States is highly concentrated, facilitating coordination of prices.  Here there is control of a large share of production by a few players.  YKK is the largest zipper manufacturer in the world with

50% of the worldwide market share. Coats is the second largest producer. Together with Prym, these three defendants alone exercise control of the Fasteners and Zippers market which far exceeds the United States Department of Justice's (DOJ) guidelines for a highly concentrated industry.

57.     High concentration facilitates coordination since there are fewer cartel members among which to coordinate pricing or allocate markets, and it is easier to monitor pricing and production of other cartel members.

58.     There appear to be few, if any, available substitutes for Fasteners and Zippers. When there are substitutes available, the effect of supra-competitive pricing is to induce switching by purchasers to substitute products. When no substitutes are available, cartel members can raise the price without purchasers being able to switch from the product. The lack of available substitutes for a product facilitates collusion among competitors.

59.     Fasteners and Zippers are sold to the apparel industry, where there are literally thousands of firms engaged in production at any point in time. In 2002, there were over 9,000 firms listed by the U.S. Census Bureau as being engaged in apparel manufacturing. Thus, there are many thousands of purchasers of Fasteners and Zippers.

60.     With many buyers, each of which constitutes a small share of the total marketplace, there is less incentive for cartel members to cheat on collusive pricing arrangements, since each potential sale is small, while the risk of disrupting the collusive pricing arrangements carries large penalties.

61.     Defendants all sell as horizontal competitors at the same wholesale and retail levels of distribution chain. When sellers operate at different levels of the

distribution chain, it is more difficult to monitor adherence to the cartel arrangement. When sellers operate at the same level of the distribution chain, as in this industry, it is easier to monitor adherence to the arrangement.

62.    Defendants sell, and Plaintiff and members of the Class purchase Fasteners and Attaching Machines primarily on the basis of price. One Defendant's Fasteners and Attaching Machines are substitutable for another's. As one supplier in this market describes it, when quality is good enough for garment uses across suppliers, then potential suppliers "can compete only on price." Price is the most important competitive factor in Fasteners and Attaching Machines, and the standardized nature of Fasteners and Attaching Machines hinders substantial and material non-price competition.

## FRAUDULENT CONCEALMENT

63.    Throughout and beyond the conspiracy, Defendants and their co-conspirators affirmatively and actively concealed their unlawful conduct from Plaintiff. Defendants and their co-conspirators conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives. Defendants and their co-conspirators publicly provided pretextual and false justifications regarding their pricing decisions, concealed their activities to avoid detection. Plaintiff did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws as alleged herein until shortly before this class action litigation was commenced.

64.    As a result of the active concealment of the conspiracy by Defendants and their co-conspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## FIRST CAUSE OF ACTION

### (Violation of Section 1 of the Sherman Act)

65.　　Plaintiff incorporates and realleges, as though fully set forth herein, each allegation set forth in the preceding paragraphs of this Complaint.

66.　　Beginning at least as early as January 1, 1977 and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade to artificially raise, fix, maintain, and/or stabilize prices for Fasteners and Attaching Machines in the United States, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

67.　　In formulating and carrying out the alleged agreement, understanding, and conspiracy, the Defendants and their co-conspirators perpetuated the acts which they combined and conspired to do, including but not limited to the act, practices, and course of conduct set forth above, and the following, among others:

　　　　a.　　Fixing, raising, maintaining and stabilizing the price of Fasteners and Attaching Machines;

　　　　b.　　Allocating production of Fasteners and Attaching Machines;

　　　　c.　　Allocating customers, geographic markets and product markets; and

　　　　c.　　Restricting output of Fasteners and Attaching Machines.

68.　　The combination and conspiracy alleged herein has had the following effects, among others:

a.    Price competition in the sale of Fasteners and Attaching Machines has been restrained, suppressed, and/or eliminated in the United States;

b.    Prices for Fasteners and Attaching Machines sold by Defendants and their co-conspirators have been fixed, raised, maintained and stabilized at artificially high, non-competitive levels throughout the United States; and

c.    Those who purchased Fasteners and Attaching Machines directly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

69.    Plaintiff and the Class have been injured and will continue to be injured in their business and property by paying more for Fasteners and Attaching Machines purchased directly from the Defendants and their co-conspirators than they would have paid and will pay in the absence of the combination and conspiracy.

70.    Plaintiff and the Class are entitled to treble damages and an injunction against Defendants, preventing and restraining the violations alleged herein.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that:

A.    The Court determine that the Sherman Act claim alleged herein may be maintained as a class action under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure;

B.     The unlawful conduct, contract, conspiracy or combination alleged herein be adjudged and decreed to be restraint of trade or commerce in violation of Section 1 of the Sherman Act;

C.     Plaintiff and the Class recover damages, as provided by federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with such laws;

D.     Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner: (1) continuing, maintaining, or renewing the conduct, contract, conspiracy or combination alleged herein, or from entering into any other conspiracy alleged herein, or from entering onto any other contract, conspiracy or combination having a similar purpose of effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect, and (2) communicating or causing to be communicated to any other person engaged in the sale of Fasteners and Attaching Machines, information concerning bids of competitors.

E.     Plaintiff and members of the Class be awarded pre- and post-judgment interest, and that that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action; and

F.     Plaintiff and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

G.    Plaintiff and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY TRIAL DEMAND

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury for all issues so triable.

Dated: January 3, 2008

ABRAHAM, FRUCHTER & TWERSKY, LLP

By:  _____

Jack G. Fruchter (JF-8435)
Jeffrey S. Abraham (JA-2946)
Arthur J. Chen (AC-5233)
One Penn Plaza, Suite 2805
New York, New York 10119
Tel.: (212) 279-5050
Fax: (212) 279-3655

**Attorneys for Plaintiff**